# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| FRANK WILLIAM BONAN, II, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| FEDERAL DEPOSIT INSURANCE | ) | |
| CORPORATION; MARTIN J. GRUENBERG, | ) | |
| in his official capacity as Chairman of the FDIC; | ) | |
| MICHAEL J. HSU, in his official capacity as a | ) | |
| Director of the FDIC; ROHIT CHOPRA, in his | ) | |
| official capacity as a Director of the FDIC; | ) | **JURY TRIAL DEMANDED** |
| TRAVIS HILL, in his official capacity as Vice | ) | |
| Chairman of the FDIC; JONATHAN | ) | |
| MCKERNAN, in his official capacity as a Director | ) | |
| of the FDIC; and JENNIFER WHANG, | ) | |
| in her official capacity as an Administrative | ) | |
| Law Judge, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Frank William Bonan, II ("Bonan") files this Complaint against the Federal

Deposit Insurance Corporation ("FDIC"); Martin J. Gruenberg, in his official capacity as Chairman

of the FDIC; Travis Hill, in his official capacity as Vice Chairman of the FDIC; Michael J. Hsu, in

his official capacity as a member of the board of directors of the FDIC; Rohit Chopra, in his official

capacity as a member of the board of directors of the FDIC; Jonathan McKernon, in his official

capacity as a member of the board of directors of the FDIC; and Jennifer Whang ("ALJ Whang"),

in her official capacity as one of the administrative law judges used by the FDIC.

Bonan, by and through his undersigned attorneys, alleges as follows:

## **INTRODUCTION**

1.     The purpose of this lawsuit is to prevent the FDIC, its directors, and an administrative law judge from continuing an unconstitutional enforcement action against Bonan.

2.     In 2016, the FDIC began investigating Bonan based on allegations that he had engaged in unsafe and unsound banking practices in connection with Grand Rivers Community Bank ("Grand Rivers").  After an investigation, the Department of Justice declined to prosecute Bonan despite the FDIC's request.

3.     The FDIC resolved to pursue the allegations on its own ("Enforcement Proceeding") and filed a Notice of Charges ("Notice") against Bonan, seeking to strip Bonan of his ability to participate in banking, 12 U.S.C. § 1818(e), and to impose on him a $105,000.00 fine, 12 U.S.C. § 1818(i)(2).  The Notice is attached hereto as Exhibit A.

4.     Although Bonan disagrees with the allegations included in the Notice, this lawsuit has nothing to do with the merits of those allegations.  Instead, this lawsuit is entirely about how the FDIC is adjudicating its allegations against Bonan.   The Enforcement Proceeding is unconstitutional for three independent reasons.

5.     First, the Enforcement Proceeding violates the Seventh Amendment because it deprives Bonan of his right to a jury trial.  In its recent published decision in *Jarkesy v. SEC*, the Fifth Circuit explained that the Seventh Amendment guarantees a jury trial in any administrative enforcement action "akin to traditional actions at law," specifically including "actions seeking civil penalties."  34 F.4th 446, 451-52 (5th Cir. 2022).  The Enforcement Proceeding is exactly such an action.  This case is essentially a carbon copy of *Jarkesy*, where the Fifth Circuit held that the petitioner was entitled to a jury trial, not merely an agency "hearing," in a case where the Securities and Exchange Commission ("SEC") sought civil penalties against the petitioner. *Id.* at 451-59.

6.      Second, the structure of the FDIC's board of directors is unconstitutional.  In *Seila Law LLC v. CFPB*, the Supreme Court held that the President must be able to remove at will the heads of independent agencies that are "vested with significant executive power." 140 S. Ct. 2183, 2201 (2020).   The FDIC wields significant executive power because it routinely conducts enforcement actions that have a significant impact on the livelihoods of regulated parties and on the national economy more generally.  But the President cannot remove a majority of the FDIC's Board ("Board") without showing good cause.  This arrangement violates fundamental separation-of-powers principles and renders the entire Enforcement Proceeding unconstitutional.

7.      Third, the tenure protections afforded to the ALJs used by the FDIC are unconstitutional.  In recent years, case law from the United States Supreme Court has clarified two important principles of law.  The first of those principles is that the President cannot "be restricted in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 484 (2010) (*"PCAOB"*).  So-called "double for-cause removal protections" for inferior officers of the United States violate the Take Care Clause.  *Id.* at 487, 492.  The second principle is that ALJs are inferior officers of the United States.  *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018).

8.      There is no dispute that the ALJs used by the FDIC are "officers" of the United States. The Fifth Circuit issued a published decision holding as much.  *See Burgess v. FDIC*, 871 F.3d 297, 302-03 (5th Cir. 2017).  Likewise, there can be no dispute that the ALJs used by the FDIC enjoy at least two levels of protection from removal:  Those ALJs can be fired only if the Merit Systems Protection Board ("MSPB") determines there is cause for their termination.  The members of the MSPB can be removed from their offices only for cause.

9.    In fact, the removal protections for the FDIC ALJs are even <u>more</u> constitutionally problematic than the removal protections found unconstitutional in *PCAOB*.  ALJs who work for the FDIC are part of an obscure administrative entity known as the Office of Financial Institution Adjudication ("OFIA").   OFIA ALJs work for four separate federal agencies with related jurisdiction ("<u>Banking Agencies</u>").   The ALJs cannot be referred to the MSPB for removal proceedings unless all four of the Banking Agencies unanimously agree on that course of action. And three of the four Banking Agencies, including the FDIC, are headed by multi-member bodies in which a majority of the agency's directors enjoy for-cause protection against removal.  So in order to remove an ALJ, 11 individuals would have to agree.  Of those 11 people, at least 9 cannot be fired at will by the President.

10.    Bonan is entitled to a judgment declaring that the entire Enforcement Proceeding violates the Constitution and that the FDIC may not continue the proceeding in any way. Bonan also respectfully submits that he is entitled to a stay of or injunction against the Enforcement Proceeding pending disposition of the claims presented in this Complaint.

## JURISDICTION AND VENUE

11.    This Court has competent subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the United States Constitution.  *See Cochran v. SEC*, 20 F.4th 194, 198-204 (5th Cir. 2021) (en banc) (noting that federal district courts have jurisdiction to adjudicate constitutional claims challenging the structure of an agency, regardless of the contemporary pendency of related agency proceedings), *cert. granted*, 142 S. Ct. 2707 (2022).

12.    This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and under its inherent equitable powers.

13.     Venue is proper in this District because a "substantial part of the events . . . giving rise to the claim[s]" in this Complaint occurred in this District.  28 U.S.C. § 1391(b)(2).  The administrative hearing is set to occur in this District.

14.     Venue is also proper in this District because (1) Defendants are officers or employees of the United States or an agency thereof acting in their official capacities, and an agency of the United States, (2) Plaintiff resides in this District, and (3) no real property is involved in this action.  28 U.S.C. § 1391(e)(1)(C).

## PARTIES

15.     Plaintiff Frank William Bonan, II is a natural person who maintains his principal residence in this District.  Bonan was the Chairman of the Board of Grand Rivers in Grand Chain, Illinois from August 2010 to March 2016.  He was also the President of the Southern Illinois Division for Peoples National Bank ("PNB") from August 2003 to June 2016.

16.     The FDIC is an agency of the federal government that, among other things, supplies deposit insurance to depositors in American banks and other depository institutions. *See* 12 U.S.C. §§ 1811(a), 1815, 1817-18. The FDIC has wide-ranging enforcement power over banks and bankers.  It exercises that authority to investigate wrongdoing and ensure compliance with banking laws.  The Board of the FDIC is composed of five members.  12 U.S.C. § 1812(a)(1).  Three of those members are appointed by the President to fixed, six-year terms.  *Id.* § 1812(c)(1).  The remaining two directors are "dual hat" and *ex officio* members of the Board:  the Comptroller of the Currency ("Comptroller") and the Director of the Consumer Financial Protection Bureau ("CFPB"). *See id.* § 1812(a)(1)(B)-(C).

17.     Defendant Martin J. Gruenberg is a natural person who currently serves as the Chairman of the FDIC.

18.     Defendant Michael J. Hsu is a natural person who currently serves as the Acting Comptroller and as an *ex officio* member of the board of directors of the FDIC.

19.     Defendant Rohit Chopra is a natural person who currently serves as Director of the CFPB and as an *ex officio* member of the board of directors of the FDIC.

20.     Defendant Travis Hill is a natural person who currently serves as the Vice Chairman of the FDIC.

21.     Defendant Jonathan McKernan is a natural person who currently serves as a member of the board of directors of the FDIC.

22.     Defendant Jennifer Whang is a natural person who currently serves as an Administrative Law Judge with OFIA.

## FACTS

### A.     The purpose of the FDIC

23.     Congress has authorized the FDIC to investigate banks and bankers and to enforce a variety of federal banking laws and regulations. The FDIC is empowered by the Federal Deposit Insurance Act of 1950, as amended ("FDI Act"), to issue a "notice of charges" against an enforcement target, 12 U.S.C. § 1818(b)(1); to issue "cease-and-desist orders," *id.* § 1818(b)-(c); to conduct hearings, *id.* § 1818(h); to force banks to "correct conditions" resulting from violations of laws, *id.* § 1818(b)(6); and to levy significant civil monetary penalties for violations of applicable laws and regulations, *id.* § 1818(i)(2).

24.     The most severe sanctions the FDIC can issue are "removal and prohibition" orders. 12 U.S.C. § 1818(e). A removal order operates to remove its subject from the bank-related offices specified by the FDIC in that order (e.g., as a director of a bank). *Id.* § 1818(e)(1)(C), (e)(4). A prohibition order will operate to forever bar its subject from "participat[ing] in any manner in the

conduct of the affairs of <u>any</u>" bank, absent the FDIC's future consent.  12 U.S.C. § 1818(e)(6) (emphasis added); *see id.* § 1818(e)(7).  As the FDIC has noted, the "sanction of prohibition is possibly the most severe permitted by banking law." *In re Dibella*, No. FDIC-92-300e, 1994 WL 16012553 (FDIC Nov. 28, 1994).

25.     Congress has empowered the FDIC to seek a "civil monetary penalty" against an enforcement target. *See* 12 U.S.C. § 1818(i).  Section 8(i) of the FDI Act provides that any banker who "breaches any fiduciary duty" shall "pay a civil penalty of not more than $25,000 for each day during which such . . . breach continues." *Id.* § 1818(i)(2)(B)(i)(III), (i)(2)(B)(ii)(III).

26.     When the FDIC issues a notice to begin removal or prohibition proceedings, that notice must both (1) "contain a statement of facts constituting grounds" for the charges and (2) "fix a time and place at which a hearing will be held thereon."  12 U.S.C. § 1818(e)(4).

27.     Upon the initiation of enforcement proceedings, the parties litigate in a "hearing" before an administrative law judge.  *See* 12 C.F.R. § 308.35; *see id.* § 308.5(a) (noting that adjudicative hearings at the FDIC "shall be conducted" by ALJs "in accordance with the provisions of" the Chapter 5 of the Administrative Procedure Act, 5 U.S.C §§ 500-596).

28.     After the hearing concludes, the ALJ prepares a "recommended decision" for presentation to the FDIC's Board, which will include both "recommended findings of fact" and "recommended conclusions of law."  12 C.F.R. §§ 308(b)(8), 308.38.  Parties may then file "exceptions" to the ALJ's recommended decision with the FDIC's "Administrative Officer." *Id.* § 308.39.  The Administrative Officer then refers the matter (including the recommended decision and the parties' exceptions) "to the [FDIC] Board of Directors for final decision." *Id.* § 308.40(a).

29.     At that point, the FDIC's Board may either (1) "render a final decision" or (2) "order[] that the action or any aspect thereof be remanded to the administrative law judge for further

proceedings."  12 C.F.R. § 308.40(c)(2).[1]  If the FDIC "find[s] that any of the grounds specified in [the] notice have been established" based on its review of "the record made at [the] hearing," then the FDIC may issue orders of removal and/or prohibition.  12 U.S.C. § 1818(e)(4).

### B.    The structure of the FDIC, OFIA, and their Administrative Law Judges

30.    Federal law currently provides that the Board will have five members.  12 U.S.C. § 1812(a)(1).

31.    Three of those members are appointed by the President to fixed, six-year terms.  12 U.S.C. § 1812(c)(1).  The three appointed members of the FDIC are tenure-protected and may be removed by the President only for cause.  *See Weiner v. United States*, 357 U.S. 349, 352, 356 (1958) (equating fixed-length terms with for-cause removal protection); *PCAOB*, 561 U.S. at 487 (same).

32.    The remaining two FDIC directors are the Director of the CFPB and the Comptroller.  *See id.* § 1812(a)(1)(B)-(C).  The President may remove the Director of the CFPB and the Comptroller at will.  *See Seila Law LLC*, 140 S. Ct. at 2192, 2209; 12 U.S.C. § 2.

33.    Prior to June 2020, four of the Board's five members (all except for the Comptroller) enjoyed "for cause" protection.  *See Seila Law LLC*, 140 S. Ct. at 2192, 2209.  Under current law, the President cannot remove a majority of the FDIC Board at will because three of its five members enjoy "for cause" protection.

34.    Section 916 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") required a specified group of "Federal banking agencies" to "jointly . . . establish their own pool of administrative law judges" and "develop a set of uniform rules and procedures for administrative hearings" before those judges.  Pub. L. No. 101-73 § 93, 103 Stat. 183, 486 (Aug. 9, 1989) (codified at 12 U.S.C. § 1818 note (1992)).

---

[1] In some cases (e.g., in certain cases involving fraud), the ALJs used by the FDIC can render final decisions.

35.     After FIRREA was passed, a group of agencies with banking-related jurisdiction developed a common set of procedures to be used in administrative hearings.  Those agencies ("Banking Agencies") included the FDIC, the Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System ("FRB"), and the National Credit Union Administration ("NCUA").  *See generally Uniform Rules of Practice and Procedure*, Final Rule, 56 Fed. Reg. 37,968 (FDIC Aug. 9, 1991).

36.     The Banking Agencies also executed a so-called "Interagency Administrative Law Judge Agreement" in May of 1991 ("1991 OFIA Agreement"), a copy of which is attached hereto as Exhibit B.  Through the 1991 OFIA Agreement, the Banking Agencies purported to "create[]" a new entity called the "Office of Financial Institution Adjudication."  Ex. A at 2 ¶ 1(e).  The 1991 OFIA Agreement further provides that the "administrative law judges" of OFIA "will be selected by mutual agreement among the [Banking] Agencies."  *Id.* at 2 ¶ 2(a).

37.     The Banking Agencies entered into an "Amended and Restated Administrative Law Judge Agreement" in July of 2011 ("2011 OFIA Agreement"), a copy of which is attached hereto as Exhibit C.  The 2011 OFIA Agreement provided that the FDIC, in its capacity as the "host" agency for OFIA, "shall employ the administrative law judges of the [OFIA] Staff" but that "[a]ny change to the Office Staff personnel"—specifically including the OFIA ALJs—"shall be subject to the prior written approval of all [Banking] Agencies."  Ex. B at 3 ¶ 3; *see id.* at 8.

38.     The Banking Agencies entered into the "Administrative Law Judge Agreement of 2018" in December of 2017 ("2018 OFIA Agreement"), a copy of which is attached hereto as Exhibit D.  The 2018 OFIA Agreement renewed the 2011 OFIA Agreement, the latter of which was set to expire at the end of 2017.  *See* Ex. C at 1 (final "whereas" clause).  The 2018 OFIA

Agreement continues to provide that "[a]ny change to the Office Staff personnel shall be subject to the prior written approval of all [Banking] Agencies." *Id.* at 3 ¶ 2; *see id.* at 7.

39.     At present, OFIA "presides over administrative enforcement proceedings brought by" the FDIC, OCC, FRB, and NCUA, "and issues recommended decisions to the relevant agency head." *About Us*, Off. of Fin. Institution Adjudication, https://bit.ly/3UEwxfr (last visited Dec. 29, 2022). OFIA's website states that the "administrative operations of OFIA are governed by an interagency memorandum of understanding"—i.e., the 2018 OFIA Agreement—which "provide[s] for general oversight by an interagency committee and cost-sharing among the constituent agencies." *Id.*

40.     There are currently two ALJs within OFIA: Jennifer Whang (a Defendant here) and Christopher McNeil.  ALJ Whang was appointed as an OFIA ALJ in 2019.[2]

41.     FDIC regulations provide that hearings "shall be held before an administrative law judge of the Office of Financial Institution Adjudication." 12 C.F.R. § 308.103(a).

42.     Pursuant to the FDIC's regulations, the "administrative law judge shall have all powers necessary to conduct a proceeding." 12 C.F.R. § 308.5(a).  The ALJs used by the FDIC have authority to issue subpoenas, rule on the admissibility of evidence, regulate hearings, rule on a variety of procedural and substantive motions, and "do all other things necessary and appropriate to discharge the duties of a presiding officer." *Id.* § 308.5(b)(2), (3), (5), (7), (11).  As the Fifth Circuit explained in a published decision, the ALJs used by the FDIC "carry out important functions over which they exercise significant discretion." *Burgess*, 871 F.3d at 302 (internal brackets, punctuation, and

---

[2] On October 28, 2019, the FDIC's Board adopted a resolution "appoint[ing] Administrative Law Judge Jennifer Whang as an administrative law judge for the FDIC." *See Resolution*, FDIC (Oct. 28, 2019), https://bit.ly/3r54Kaz.  The following month, ALJ Whang was appointed as an ALJ for OCC.

quotations omitted); *see id.* (discussing these ALJs' "broad authority to preside over agency adjudications and issue recommendations").

43.    To remove an ALJ used by the FDIC, all four of the Banking Agencies would need to unanimously concur, in writing, to the initiation of removal proceedings.  Assuming the Banking Agencies are fully staffed, initiating a removal proceeding would require separate sign-offs from at least 9 different people—the Comptroller, 3 of the 5 members of the FDIC Board (one of whom could be the Comptroller),[3] 4 of the 7 members of the FRB, and 2 of the 3 members of NCUA.

44.    Even then, the ALJ could not be fired unless at least 2 of the 3 members of the MSPB also found that there was cause to do so.  *See* 5 U.S.C. § 7521(a) (ALJs can be removed only for "good cause established and determined by the Merit Systems Protection Board").

45.    Ultimately, at least 11 different people would need to agree that it is appropriate to terminate an ALJ before that ALJ could be removed from office.  And at least 9 of those people are themselves tenure protected.

46.    All of the directors of the FRB and NCUA are tenure-protected and may be removed only for cause.  *See* 12 U.S.C. § 242 (FRB); *id.* § 1752a(c) (NCUA).  Similarly, the members of the MSPB can be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office."  5 U.S.C. § 1202(d); *see Long v. Soc. Sec. Admin.*, 635 F.3d 526, 534-35 (Fed. Cir. 2011).

47.    If the President wanted to remove an ALJ used by the FDIC but the aforementioned 11 parties did not all agree with his or her view, the President would need to show cause to remove

---

[3] The FDIC's bylaws require a majority vote before any action is taken.  FDIC Bylaws art. IV, § 6(d).  Initiating a removal proceeding against an ALJ would require 10 votes—1 from the Comptroller, 3 from the FDIC, 4 from the FRB, and 2 from NCUA.  But because the Comptroller could vote in two separate capacities (i.e., as both the head of OCC and as a member of the FDIC's Board), those 10 votes could technically be cast by as few as 9 people.

(1) the ALJ; (2) a majority of the MSPB; (3) at least one appointee to the FDIC Board[4]; (4) a majority of the Directors of the FRB; and (5) a majority of directors of NCUA.

**B.    The FDIC's Enforcement Proceeding against Bonan**

48.    In 2016, the FDIC began investigating Bonan based on a number of unfounded allegations.

49.    Ultimately, the United States Attorney's Office for the Southern District of Illinois declined to prosecute Bonan despite the FDIC's request.

50.    Undeterred, the FDIC filed the Notice against Bonan in May 2021.  The Notice alleges that Bonan "recklessly engaged or participated in unsafe or unsound banking practices in connection with" Grand Rivers.  Ex. A at ¶ 119.  The Notice says he did so by (1) "orchestrating" a $1.25 million loan from Grand Rivers to 618 Holdings LLC ("618 Holdings") to generate lease revenue to pay Evergreen Properties' outstanding loans to Grand Rivers, and (2) directing the release of collateral, known as Rig 23, securing a loan to another Evergreen entity called Evergreen Drilling.  *See* Ex. A at ¶¶ 116-17, 119.

51.    The loan to 618 Holdings occurred in an effort to repair Evergreen Drilling's loan relationship with Grand Rivers and PNB.  Bonan's strategy contemplated the sale of real estate owned by Evergreen Properties, the Carmi Property, first to an entity owned by Abbey Evans, one of the owners of Evergreen Drilling, and then to an entity owned by Bonan.  Those sales did not materialize.  The strategy ultimately resulted in a sale to 618 Holdings, LLC, an entity created by Adam Tate, one of Bonan's employees, and Jason Harbison, an independent contractor.  The

---

[4] The President can remove the Comptroller and the CFPB Director from office at will but would need to establish cause to remove any of the appointed FDIC directors (and ergo remove a majority). If the President is unwilling to remove the Comptroller or the CFPB Director—which would be understandable given that such removal would also remove them from heading their "home" agencies—he would need to remove three appointed FDIC Board members.

Grand Rivers board voted to approve the loan to 618 Holdings to fund the purchase of the Carmi Property. Bonan abstained from the vote. 618 Holdings purchased the Carmi Property and leased it back to Evergreen Properties for a period of five years.

52.     The release of Rig 23 occurred in connection with the sale of a different oil rig, known as Rig 24. During the sale process, Bonan forwarded an email from an Evergreen Drilling employee that requested a UCC-1 release from Grand Rivers on Rig 24 to attach to the purchase and sale agreement. About a month later, another Evergreen Drilling employee again requested the UCC-1 release. Bonan forwarded the email to Kassie Winters and Grady Gaskins, instructing them to get the releases. Kassie Winters responded the same day by forwarding UCC financing termination statements for Rig 23 rather than for Rig 24.

53.     Gaskins testified in his deposition on December 7, 2022, that he, Bonan, and Winters all believed Winters had sent Evergreen Drilling the release paperwork for Rig 24 and that the release of Rig 23 was a mistake. *See* Exhibit E (Gaskins deposition) at 131-33.

54.     Based on the sale to 618 Holdings and the release of Rig 23, the FDIC claims Bonan breached his fiduciary duties to Grand Rivers. Ex. A at ¶ 120.

55.     The FDIC claims that Bonan's actions have resulted in financial loss and other damage to Grand Rivers, demonstrate his personal dishonesty, and demonstrate his "continuing disregard for the safety and soundness" of Grand Rivers. Ex. A at ¶¶ 121-23.

56.     The Notice seeks to strip Bonan of his ability to participate in banking, 12 U.S.C. § 1818(e), and to impose on him a $105,000.00 fine, 12 U.S.C. § 1818(i)(2). Ex. A at p. 24.

57.     A hearing on the foregoing issues is set to occur before ALJ Whang on January 17, 2023, in the Thomas F. Eagleton United States Courthouse in St. Louis, Missouri.

C.    **The Northern District of Texas's Recent Decision**

58.    The United States District Court for the Northern District of Texas recently granted a preliminary injunction prohibiting the FDIC and ALJ Whang from proceeding with an enforcement action against a plaintiff, who, like Bonan, was a former bank executive accused by the FDIC of breaching his fiduciary duties owed to a bank. *Burgess v. Federal Deposit Ins. Corp.*, No. 7:22-cv-00100-O, 2022 WL 17173893 (N.D. Tex. Nov. 6, 2022).  The court based its decision on its analysis that the plaintiff had shown a substantial likelihood of success on his claim that the FDIC's enforcement action had violated his Seventh Amendment right to a jury trial.  *Id.* at *11. While the court did not grant the plaintiff a preliminary injunction based on his other two claims, it noted specifically the merit of the plaintiff's claims based on the Board's structure and the removal protections afforded FDIC ALJs.  *Id.* at *9.

## STANDING

59.    Bonan has Article III standing to pursue the claims in this Complaint.

60.    "To establish Article III standing, a plaintiff must show" that he [1] "has suffered an 'injury in fact' that is [2] 'fairly traceable' to the defendant's conduct and [3] would likely be 'redressed by a favorable decision.'"  *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

61.    With respect to the injury-in-fact requirement, Bonan has suffered, is suffering, and will continue to suffer an injury in fact as a result of the Defendants' conduct.

62.    Being forced to endure agency proceedings conducted by officers who have unconstitutional protections from removal is itself an injury to a constitutional right.  Separation-of-powers problems related to the exercise of executive authority over a citizen create a "here-and-now" injury that is ripe as soon as that executive power is exercised (or as soon as its exercise is

imminent). *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986); *see Seila Law*, 140 S. Ct. at 2196 ("[P]rivate parties aggrieved by an official's exercise of executive power [are permitted] to challenge the official's authority to wield that power while insulated from removal by the President.").

63.     Parties like Bonan are clearly "entitled to declaratory relief sufficient to ensure that the [legal] standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive." *PCAOB*, 561 U.S. at 513; *accord Seila Law*, 140 S. Ct. at 2196 ("In the specific context of the President's removal power, we have found it sufficient that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority." (quoting *Bowsher*, 478 U.S. at 721)); *Cochran*, 20 F.4th at 244 (Oldham, J., concurring) ("A person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding."); *see id.* at 233 (noting that a lawsuit of the type bought here "may be the only way to provide a 'meaningful avenue of relief'" when a plaintiff challenges an agency's "unimpeded control over the way it investigates and proceeds against its targets").

64.     The Enforcement Proceeding has inflicted and is continuing to inflict significant reputational injuries on Bonan.  The investigation has included multiple reports to Grand Rivers, extensive discovery involving third parties, and a public hearing set to begin on January 17, 2023.  These reputational injuries are injuries-in-fact for purposes of Article III standing.  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("reputational harms" are sufficient to constitute an injury for purposes of Article III standing); *Meese v. Keene*, 481 U.S. 465, 473-75 (1987) (plaintiff had standing to challenge government action that "would adversely affect his reputation in the community"); *Robertson v. Colvin*, 564 F. App'x 931, 934 (10th Cir. 2014) ("[I]njury to one's

reputation can be a cognizable injury-in-fact to confer standing to bring suit."); *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 220 (3d Cir. 2013) ("[R]eputational harm is a cognizable injury in fact."), *abrogated on other grounds sub. nom Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

65.     Additionally, Bonan has incurred hundreds of thousands of dollars in legal fees defending against the Enforcement Proceeding.  This "pocketbook injury is a prototypical form of injury in fact."  *Collins*, 141 S. Ct. at 1779; *see Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("When the alleged harm is economic, the injury in fact question is straightforward." (internal quotation marks omitted)); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) ("[E]conomic injury is a quintessential injury upon which to base standing.").

66.     If the Enforcement Proceeding moves forward, Bonan will be denied his Seventh Amendment right to a jury trial, a structural error that plainly amounts to an injury in fact.  If this Court were to agree that Bonan is entitled to a trial by jury, many of the expenses he has already incurred in defending against the Enforcement Proceeding, plus the expenses he will incur in a trial before the ALJ, will have been a waste, because the FDIC will be required to begin its Enforcement Proceeding again in federal court.

67.     There is a causal connection between Bonan's injuries and Defendants' conduct. All of Bonan's injuries are attributable to and were inflicted by the Defendants, and there is a clear causal connection between the Defendants' unlawful exercise of executive power over Bonan and the injuries he has suffered as a result of the Enforcement Proceeding and may suffer in the future. Had the Defendants never initiated the Enforcement Proceeding, Bonan would not have suffered

the financial and reputational injuries discussed above and would not have been forced to endure the harm of an unconstitutional agency proceeding.  *See Collins*, 141 S. Ct. at 1779.

68.     Bonan's injuries in fact are redressable through this lawsuit because the Court can and should declare that (1) Bonan is entitled to a jury trial and (2) the structure of the FDIC and the removal protections for FDIC Directors and the ALJs used by the FDIC violate separation of powers principles.  Additionally, the Court can and should enjoin the continuation of the Enforcement Proceeding.  That relief would terminate Bonan's injury of exposure to an unlawful agency proceeding and would terminate the related injuries associated with the ongoing expense of that proceeding. Such relief would also prevent future imminent injuries that will be inflicted by the FDIC, such as violating Bonan's right to a jury trial, imposing sanctions, or imposing civil monetary penalties.

## CLAIMS FOR RELIEF

### Count I (Declaratory Relief and Injunction): Absent the Court's intervention, the FDIC will deprive Bonan of his Constitutional right to a jury trial

69.     Bonan incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

70.     The Founders described the right to a trial by jury as "the heart and lungs of liberty"[5] and as "the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution."[6]  The Supreme Court has aptly described jury trials as "fundamental" to the American legal system and as "one of our most vital barriers to "governmental arbitrariness." *Reid v. Covert*, 354 U.S. 1, 9-10 (1957).

---

[5] *The Revolutionary Writings of John Adams* 55 (C. Bradley Thompson ed., 2000).

[6] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in The Papers of Thomas Jefferson* 267 (Julian P. Boyd ed., 1958).

71.     "Civil juries in particular have long served as a critical check on government power. So precious were civil juries at the time of the Founding that the Constitution likely would not have been ratified absent assurance that the institution would be protected expressly by amendment." *Jarkesy*, 34 F.4th at 451-52.  The Supreme Court has repeatedly confirmed that "[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence" that "any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

72.     The Seventh Amendment to the United States Constitution provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

73.     In *Tull v. United States*, the Supreme Court construed the Seventh Amendment "to require a jury trial on the merits in those actions that are analogous to 'Suits at common law'" because, "[p]rior to the Amendment's adoption, a jury trial was customary in suits brought in the English <u>law</u> courts." 481 U.S. 412, 417-18 (1987) (emphasis altered).  *Tull* confirmed that the fact that the cause of action giving rise to the dispute was "created by congressional enactment" does not mean no jury trial is required.  *Id.* at 417.  Instead, the operative question is whether the "statutory action is . . . <u>similar to</u> cases that were tried in courts of law." *Id.* (emphasis added); *see Jarkesy*, 34 F.4th at 452 (noting that the term "Suits at common law" can "include suits brought under a statute as long as the suit seeks common-law-like legal remedies").  *Tull* instructed that, in determining whether a statutory action is "similar to cases that were tried in courts of law," a court should "examine both the nature of the action and of the remedy sought." 481 U.S. at 417.

74.     All that said, the Supreme Court has held that Congress may assign the adjudication

of certain disputes to agencies instead of juries in a limited set of cases that implicate "public rights."

"[I]n cases in which 'public rights' are being litigated"—for example, in "cases in which the

Government sues in its sovereign capacity to enforce public rights created by statutes within the

power of Congress to enact"—the "Seventh Amendment does not prohibit Congress from

assigning the factfinding function and initial adjudication to an administrative forum with which

the jury would be incompatible." *Atlas Roofing Co. v. Occupational Safety & Health Rev.*

*Comm'n*, 430 U.S. 442, 450 (1977).  The Supreme Court "refined" the concept of "public rights"

in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), where it held that "Congress cannot

circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns

'traditional legal claims' to an administrative tribunal." *Jarkesy*, 34 F. 4th at 452 (quoting

*Granfinanciera*, 492 U.S. at 52).

75.     The Fifth Circuit's recent decision in *Jarkesy* clarified that the inquiry to determine

whether an adjudication must be handled by a jury moves in "two stages":

> <u>First</u>, a court must determine whether an action's claims arise "at common law" under
> the Seventh Amendment.  <u>Second</u>, if the action involves common-law claims, a court
> must determine whether the Supreme Court's public-rights cases nonetheless permit
> Congress to assign it to agency adjudication without a jury trial. . . . [T]he relevant
> considerations include: (1) whether Congress created a new cause of action, and
> remedies therefor, unknown to the common law, because traditional rights and
> remedies were inadequate to cope with a manifest public problem; and (2) whether
> jury trials would go far to dismantle the statutory scheme or impede swift resolution
> of the claims created by statute.

*Jarkesy*, 34 F.4th at 453 (emphasis added; internal citations, brackets, and punctuation omitted).

76.     The *Jarkesy* Court then applied the test to the facts before it.  The petitioners in

*Jarkesy* had been the target of an SEC enforcement proceeding in which the agency alleged that the

petitioners had committed securities fraud and sought various remedies against him, including

substantial civil penalties.  *Jarkesy*, 34 F.4th at 449-50.  On appeal, Mr. Jarkesy argued the SEC enforcement proceeding deprived him of his constitutional right to a trial by jury.

77.     The *Jarkesy* panel began its analysis of that claim with the first question outlined above—i.e., whether the cause of action arose at common law.  The *Jarkesy* court held that the cause of action against Mr. Jarkesy <u>did</u> arise at common law because a "civil penalty was a type of remedy at common law that could only be enforced in courts of law." *Id.* at 453-54; *see also SEC v. Kopsky*, 537 F. Supp. 2d 1023 (E.D. Mo. 2008) (holding that the SEC had the right to request a jury trial where it sought a civil penalty).

78.     As to the second question—i.e., whether the Supreme Court's "public rights" cases permitted the SEC to proceed with an adjudication that did not include a jury—the *Jarkesy* panel held they did not.  The panel concluded that (1) "[s]ecurities fraud actions are not new actions unknown to the common law" and that (2) "[j]ury trials in securities fraud suits would not dismantle the statutory scheme" or "impede swift resolution of the SEC's fraud prosecutions." *Jarkesy*, 34 F.4th at 455 (internal quotation marks omitted).

79.     Because Mr. Jarkesy was entitled to a trial by jury, the Fifth Circuit ordered the entirety of the SEC's enforcement proceeding against him to be "vacated." *Id*. at 459.

80.     This case is on all fours with *Jarkesy*.  Bonan is entitled to a trial on the FDIC's allegations against him, and therefore the Enforcement Proceeding is unconstitutional.

81.     The first question under the *Jarkesy* test is whether "an action's claims arise 'at common law' under the Seventh Amendment." *Id*. at 453.  The FDIC's claims against Bonan, while nominally statutory, do arise at common law.  The FDIC seeks a civil monetary penalty against Bonan.  *Jarkesy* clearly held that the "Seventh Amendment jury-trial right applies to suits brought under a statute seeking civil penalties." *Id*.  *Jarkesy* reached that holding based on the fact that *Tull*

had established a bright-line rule that actions for civil penalties under a statute are actions "at common law" for Seventh Amendment purposes, given that such actions are analogous to common-law actions for debt.  *See Tull*, 481 U.S. at 422 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law.  Remedies intended to punish culpable individuals, as opposed to those intended simply to extract compensation or restore the status quo, were issued by courts of law, not courts of equity.").

82.     Moreover, claims where a plaintiff seeks to recover civil money penalties stemming from alleged breaches of fiduciary duties are among the types of claims that would have been adjudicated in an eighteenth-century English court of law.  *See, e.g.*, *In re Hooper*, 112 B.R. 1009, 1012 (B.A.P. 9th Cir. 1990) ("[A]n action to recover money damages for . . . breach of fiduciary duty . . . was the type of action that would have been brought in a court of law in the courts of England prior to the merger of law and equity."); *accord In re Thrall*, 196 B.R. 959, 970 (Bankr. D. Colo. 1996); *Jarkesy*, 34 F.4th at 454 (noting that "actions seeking civil penalties were akin to special types of actions in debt from early in our nation's history which were distinctly legal claims" that "could only be enforced in courts of law" (internal quotation marks omitted)).

83.     The second question under the *Jarkesy* test is whether the Supreme Court's public-rights cases "permit Congress to assign" the proceeding "to agency adjudication without a jury trial."  *Jarkesy*, 34 F.4th at 453.  The relevant subsidiary "considerations include: (1) whether Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem;" and "(2) whether jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute."  *Id.* (internal quotations omitted).

84.     One of the FDIC's chief allegations in the Enforcement Proceeding is that Bonan breached his fiduciary duties to Grand Rivers.  Ex. A at ¶ 120.

85.     Actions seeking remedies for breaches of fiduciary duties were not invented by the American Congress, but rather have been known at common law for centuries.  *See* David J. Seipp, *Trust and Fiduciary Duty in the Early Common Law*, 91 B.U. L. Rev. 1011, 1013-16 (2011).  Similarly, the remedy of civil money damages was clearly known at common law.

86.     The use of jury trials to adjudicate claims of the type that the FDIC is pursuing against Bonan would not "dismantle the statutory scheme." *Jarkesy*, 34 F.4th at 453.  When applying this factor, one critical consideration is whether the claims at issue are of "the sort . . . uniquely suited for agency adjudication." *Id.* at 456.  Claims alleging entitlement to money damages for breaches of common-law duties do not fit that bill because, just as with the securities-law claims at issue in *Jarkesy*, "federal courts have dealt with actions" of this type "for many decades." *Id.*  Indeed, claims involving requests for civil monetary penalties and breaches of fiduciary duties are heard every day by federal courts sitting in diversity and by federal courts adjudicating liability under various state and federal statutory schemes.

87.     The FDIC is no stranger to jury-eligible proceedings.  Several of its enabling statutes allow it to bring cases in federal court against bank officials accused of various forms of misconduct—an authority it has often recently invoked.  *See, e.g.*, 12 U.S.C. § 1821(k) (bankers may be held liable "for monetary damages in any civil action by, on behalf of, or at the request or direction of the [FDIC]").  The FDIC can also pursue offensive claims against regulated parties under state common law.  Indeed, outside the context of removal and prohibition proceedings, the FDIC has often brought claims in federal court that seek money damages based on alleged breaches of common law fiduciary duties by bank officers—i.e., exactly the sorts of claims at issue in

Bonan's Enforcement Proceeding.  *See FDIC v. Dee*, 222 F. Supp. 3d 972, 1031 (D.N.M. 2016); *FDIC v. Ching*, No. 2:13-cv-01710, 2016 WL 1756913, at *1 (E.D. Cal. May 3, 2016); *FDIC v. Dodson*, No. 4:13-cv-416, 2015 WL 7769520, at *1 (N.D. Fla. Sept. 25, 2015); *FDIC v. Schuchmann*, 235 F.3d 1217, 1221 (10th Cir. 2000); *FDIC v. Canfield*, 967 F.2d 443, 451 n.7 (10th Cir. 1992) (Moore, J., dissenting) (noting that "FDIC complaints" under 12 U.S.C. § 1821(k) "typically set forth claims of . . . breach of fiduciary duty").

88.    It also bears mention that Bonan does not contend here that all FDIC enforcement proceedings must proceed via jury trials in federal court, but rather that a small sub-class of those proceedings (i.e., those where the FDIC seeks civil monetary penalties or are based on allegations of breach of a fiduciary duty) must be tried before a jury (assuming that the enforcement target elects a jury trial).  Bonan expresses no view, and this Court need not decide, whether a jury right would attach when the FDIC's enforcement action does not seek civil penalties and is not based on allegations of a breach of fiduciary duty.  Bonan is asking only that a sub-set of the FDIC's enforcement proceedings, including the one against him, be tried before a jury.  There would be no disruptive consequences if this Court were to order that narrow form of relief.[7]

_____

[7] In any event, the Supreme Court confirmed in *Granfinanciera* that consideration of whether a jury trial would "dismantle the statutory scheme" would be most probative in cases where there was evidence that Congress "ha[d] given careful consideration to the constitutionality" of it routing certain classes of disputes away from juries and would be less probative in cases where there was "no evidence that Congress considered the constitutional implications" of its decision.  492 U.S. at 2800.  Here, there is no evidence that Congress gave any consideration to the constitutionality of routing FDIC enforcement actions away from juries, and its decision to do so (first made in 1966) far pre-dated the Supreme Court's subsequent creation and refinement of the "public rights" doctrine.  Moreover, the fact that routing some FDIC enforcement proceedings to jury trials might potentially pose disruption does not, without more, save an otherwise unconstitutional scheme from judicial scrutiny.  *See Granfinanciera*, 492 U.S. at 2802-03; *Bowsher*, 478 U.S. at 736 ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution.").

89.     Finally, the use of jury trials to adjudicate claims of the type that the FDIC is pursuing against Bonan would not "impede swift resolution of the claims created by statute." *Jarkesy*, 34 F.4th at 453.  In *Jarkesy*, the Court found that there was "no evidence that jury trials would impede swift resolution" of SEC enforcement proceedings and noted that, in the particular case of Mr. Jarkesy, the "SEC took seven years to dispose of" the case.  *Id.* at 456. Here, the FDIC initiated its investigation against Bonan more than 6 years ago and has been pursuing a formal Enforcement Proceeding against him since May 2021.  The Enforcement Proceeding still has not concluded.  Indeed, the hearing has not yet occurred.  Certainly a jury trial in this Court would have been much quicker than the Enforcement Proceeding.

90.     For the reasons explained above, Bonan is entitled to a jury trial.  The deprivation of a jury in cases where one is required by the Seventh Amendment is a fundamental structural error that requires immediate remedy.  *Jarkesy*, 34 F.4th at 459.

91.     Bonan is entitled to an injunction barring the FDIC and its Directors from proceeding against him through a trial held before an ALJ.

92.     Bonan is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that he is entitled to a trial by jury regarding the allegations brought in and the civil monetary penalty sought by the Notice.

**Count II (Declaratory Relief and Injunction): The FDIC is unconstitutionally structured**

93.     Bonan incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

94.     The Constitution vests "the executive Power" in the President.  U.S. Const. art. II, § 1, cl. 1.

95.     The Take Care Clause of the Constitution provides that the President must "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Take Care Clause "guarantees the President a certain degree of control over executive officers" and reflects the Founders' belief that the "President must have adequate power over officers' . . . removal" because "[o]nly then can the People, to whom the President is directly accountable, vicariously exercise authority over high-ranking executive officials."  *Jarkesy*, 34 F.4th at 463.

96.     The Supreme Court has viewed with particular disfavor limits on the President's authority to remove <u>principal</u> executive officers, such as agency heads.  *See Seila Law*, 140 S. Ct. at 2197-2200.  Because principal officers direct the policy for all inferior agency personnel, it is especially important that they be accountable to the President.  Thus, with respect to principal officers specifically, the Supreme Court confirmed in *Seila Law* that the one and only "exception[]" to the President's otherwise "unrestricted removal power" applies to "multimember expert agencies <u>that do not wield substantial executive power</u>."  *Id.* at 2199-2200 (emphasis added).  In that case alone, Congress may grant for-cause removal protections to principal officers.

97.     Thus, the operative questions for determining the constitutionality of removal protections for "officers of the United States" are (1) whether the officers are principal, as opposed to inferior; and (2) whether the agency "wield[s] substantial executive power."  If the answer to both of those questions is yes, the President must be able to fire the agency heads at will.

98.     The directors of the FDIC are principal officers because the five-member Board is the head of the agency. *See* 12 U.S.C. § 1812(a)(1).

99.     The FDIC plainly "wields substantial executive power." Indeed, the FDIC has an ample selection of executive powers, many of which closely resemble the classic examples of executive power detailed in the Supreme Court's *Seila Law* decision. For example:

a. The FDIC can unilaterally conduct administrative hearings, 12 U.S.C. § 1818, just as could the CFPB Director, *Seila Law*, 140 S. Ct. at 2200;

b. The FDIC can issue rules interpreting its enabling statutes, 12 U.S.C. § 1828, just as could the CFPB Director, *Seila Law*, 140 S. Ct. at 2200; and

c. The FDIC can seek (and here, has sought) to impose significant civil monetary penalties against a regulated party, 12 U.S.C. § 1818(i), just as could the CFPB Director, *Seila Law*, 140 S. Ct. at 2200.

100.    Because the FDIC's directors are "principal" officers who serve as the head of an agency that "wield[s] substantial executive power," it would be unconstitutional for Congress to provide for-cause removal protections for members of the FDIC Board.  But that is exactly what Congress did in 12 U.S.C. § 1812(c)(1).  That statute is therefore unconstitutional. *See Kelley v. Azar*, No. 4:20-cv-00283, 2021 WL 4025804, at \*14 (N.D. Tex. Feb. 25, 2021) (O'Connor, J.) ("Pursuant to [the] fundamental principle of the separation of powers, Congress may not create independent agencies wielding substantial executive power that are insulated from all Presidential control." (citing *Seila Law*, 140 S. Ct. at 2199)); *see also* Cass R. Sunstein & Adrian Vermeule, *The Unitary Executive: Past, Present, Future*, 2020 Sup. Ct. Rev. 83, 85 (2020) (noting that *Seila Law* casts "grave doubt" over the legality of removal protections applicable to "independent agencies with multiple heads," such as the FDIC).[8]

---

[8] *Accord* Br. of Washington Legal Foundation as *Amicus Curiae* at 28, *Calcutt v. FDIC*, 37 F.4th 293 (6th Cir. 2022), 2021 WL 1522018, at \*28 (Apr. 9, 2021) (*Seila Law* means that the "President must be able to remove FDIC directors at-will"); Adam C. Gillette, *Form Over Function: How* Collins v. Yellen *Signals a Threat to the Independence of Multimember Financial Regulatory Agencies*, 26 N.C. Banking Inst. 109, 114, 131 (2022) (suggesting that removal protections for the FDIC's appointed directors are unconstitutional under *Seila Law*); Samuel Rubinstein, *Chairpointment: Rethinking the Appointment of Independent Agency Chairpersons*, Harv. J. on Leg. Online (2020) (same); *see also* Aaron L. Nielson, *Is the FTC on a Collision Course with the Unitary Executive?*, Yale J. on Reg. Notice & Comment (noting that, under "*Collins and Seila Law*," the directors of "[m]ulti-headed independent agencies" such as the FDIC are on notice that "their removal protections . . . conflict[] with the Supreme Court's current understanding of the separation of powers").

101.    Bonan is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that the FDIC is an unconstitutionally structured agency.

102.    Bonan is entitled to an injunction barring the FDIC and its Directors from proceeding in any way with the Enforcement Proceeding.

103.    The Supreme Court confirmed in *Seila Law* that "private parties aggrieved by an official's exercise of executive power" are permitted "to challenge the official's authority to wield that power while insulated from removal by the President."  140 S. Ct. at 2196; *see Collins*, 141 S. Ct. at 1780 ("[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge.").  In such cases, the plaintiff has "an implied private right of action directly under the Constitution to challenge governmental action under . . . separation-of-powers principles." *PCAOB*, 561 U.S. at 491 n.2.

104.    Through this lawsuit, Bonan is seeking <u>prospective</u> relief.  The administrative hearing is currently scheduled to take place on January 17, 2023.  Thereafter, ALJ Whang will submit a recommended decision to the FDIC's Board, which will issue a final decision after considering any exceptions filed by the parties.  These future actions would be unconstitutional because they would constitute the exercise of executive authority by principal officers who have unlawful protection from removal.

105.    In *Collins*, the Supreme Court addressed the appropriate remedy when a plaintiff has been exposed to administrative action from an officer who enjoyed an unconstitutional level of removal protections. In that case, the plaintiffs "no longer [had] a live claim for <u>prospective</u> relief," and the "only remaining remedial question concern[ed] <u>retrospective</u> relief."  141 S. Ct. at 1787 (emphasis added).  The Court held that, in order to establish an entitlement to retrospective relief for a constitutional problem relating to removability protections, the plaintiff must show a

"compensable harm." *Id.* at 1789. For example, if the President had "attempted to remove a Director but was prevented from doing so," that would be a "compensable harm." *Id.*

106.   This case differs materially from *Collins* because Bonan is requesting <u>prospective</u> relief. Absent this Court's intervention, Bonan will continue to be subjected to the FDIC's exercise of executive power.[9]   Bonan is not seeking through this lawsuit to retrospectively "unwind" anything that the FDIC has already done; instead, he is seeking to:

  a.  Prospectively block the FDIC from continuing the Enforcement Proceeding; and

  b.  Prospectively block the FDIC from exercising any executive power (by, e.g., issuing a final decision in the Enforcement Proceeding.

107.   The Fifth Circuit's recent en banc decision in *Cochran* confirms that "*Collins* does not impact" the remedial analysis when, as here, the plaintiff "does not seek to 'void' the acts of any [agency] official" but instead merely "seeks an administrative adjudication untainted by separation-of-powers violations." 20 F.4th at 210 n.16. As Judge Oldham explained in his concurring opinion for six Judges in *Cochran*, "[a] person subject to an unconstitutional adjudication should at least be able to sue for declaratory relief requiring a constitutionally structured proceeding." *Id.* at 233 (Oldham, J., concurring); *see PCAOB*, 561 U.S. at 51 (explaining that plaintiffs are "entitled to declaratory relief sufficient to ensure that the . . . standards to which they are subject will be enforced only by a constitutional agency accountable to the Executive"). Judge Oldham noted in his *Cochran* concurrence that, "[a]fter *Collins*," a declaratory-judgment lawsuit of the type Bonan has filed today "may be the only way to provide a 'meaningful avenue of relief'" when a plaintiff challenges an

---

[9] The FDIC's regulations provide that if a "collateral attack is brought in any court concerning all or any part of an adjudicatory proceeding, the challenged adjudicatory proceeding shall continue without regard to the pendency of that court proceeding." 12 C.F.R. § 308.17. Thus, unless this court orders near-term relief, the Administrative Proceeding will continue unabated, and Bonan's right to a constitutional administrative process will be infringed.

agency's "unimpeded control over the way it investigates and proceeds against its targets."  20 F.4th at 233 (Oldham, J., concurring).[10]

## Count III (Declaratory Relief): the ALJs used by the FDIC are unconstitutionally shielded from removal

108.   Bonan incorporates by reference the allegations contained in all of the preceding paragraphs as though fully set forth herein.

109.   In *PCAOB*, the Supreme Court held that a scheme in which an inferior officer of the United States enjoys two layers of for-cause removal protection violates the Take Care Clause and offends fundamental separation-of-powers principles.  561 U.S. at 498; *see id.* at 492, 496 (multiple levels of tenure protection for inferior officers are "contrary to Article II's vesting of executive power in the President" and therefore "contravene the Constitution's separation of powers").  Applying that rule to the facts of the case, the Supreme Court held that the members of the PCAOB enjoyed an unconstitutional level of protection from removal because they could only be removed for cause by the Commissioners of the SEC, who themselves could only be removed for cause by the President.  *Id.* at 492.

110.   Footnote 10 of the *PCAOB* Opinion explicitly indicated that the Supreme Court was <u>not</u> reaching the question of how its holding would apply to "agency employees who serve as

---

[10] For this reason, district courts have not hesitated to grant relief in cases where plaintiffs have presented constitutional claims akin to those presented here.  *Consumers' Research v. Consumer Product Safety Commission* is particularly instructive. No. 6:21-cv-256, 2022 WL 1577222 (E.D. Tex. Mar. 18, 2022), *appeal docketed* (5th Cir. No. 22-40328).  In that case, plaintiffs raised removability concerns about the members of the Consumer Product Safety Commission and sought an injunction to block them from enforcing, in the future, an agency rule concerning new fees for document requests.  Judge Kernodle granted the Plaintiffs' requested declaratory judgment, reasoning that "*Collins* applies to requests for retrospective relief, not the purely prospective relief Plaintiffs seek."  *Id.* at *12; *see id.* at *5 (noting that "[s]ubjecting Plaintiffs to . . . regulation in the alleged absence of Article II oversight directly injures Plaintiffs" and noting that *Cochran* "recogniz[ed] a standalone injury creating a right to seek 'redress for the injury of having to appear before' a constitutionally suspect agency" (quoting *Cochran*, 20 F.4th at 209)); *see also id.* at *13 ("*Collins* does not apply to plaintiffs seeking prospective relief.").

administrative law judges," for the reason that "[w]hether administrative law judges are necessarily 'Officers of the United States'" was at that time "disputed."  561 U.S. at 507 n.10.

111.    In 2018, the Supreme Court decided *Lucia*, which squarely addressed the question the Court had left unanswered in footnote 10 of *PCAOB*.  In *Lucia*, the Court held that SEC ALJs are inferior officers of the United States and therefore must be appointed by either the President or the head of an agency. 138 S. Ct. at 2055.

112.    Under *Lucia*, the ALJs used by the FDIC, including Defendant ALJ Whang, are "inferior officers of the United States."  If further confirmation were needed, the Fifth Circuit indicated in a published Order that the duties of the ALJs used by the FDIC are "sufficiently important, and their discretion sufficiently significant, to render them Officers" rather than "mere employees" for purposes of the Appointments Clause.  *Burgess*, 871 F.3d at 303 (emphasis added).

113.    Under *PCAOB*, it is unconstitutional for an inferior officer of the United States to enjoy "double for-cause removal protection."  As the Supreme Court in *PCAOB* explained, there are grave constitutional defects with a system in which "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, has full control over" an inferior officer, such as an ALJ.  561 U.S. at 496.

114.    In its recent decision in *Jarkesy v. SEC*, the Fifth Circuit explained that these two principles of law meant that the removal restrictions for SEC ALJs were unconstitutional.  34 F.4th at 465.  In so holding, the panel accepted the Petitioner's "straightforward" argument:

a.    "SEC ALJs are inferior officers" under *Lucia*;

b.    "SEC ALJs are insulated from the President by at least two layers of for-cause protection from removal, which is unconstitutional under [*PCAOB*]"; and therefore

c.    the "statutory removal restrictions" for SEC ALJs "are unconstitutional."

*Id.* at 464-65.  *Jarkesy* is persuasive, on-point authority. There is no material legal difference between the SEC ALJs at issue in *Jarkesy* and the ALJs used by the FDIC.  In both schemes, the ALJs can be removed only for cause following a determination made by the MSPB.  In fact, the constitutional defect with the ALJs used by the FDIC is <u>more</u> problematic than the defect at issue in *Jarkesy*.  A proceeding to remove one of the ALJs used by the FDIC cannot even be initiated by the FDIC's Board unilaterally.  Instead, all four of the Banking Agencies must all agree to initiate a removal action.

115.    Because the ALJs used by the FDIC are inferior officers of the United States who enjoy double for-cause removal protection, it is unconstitutional for them to act as adjudicators in administrative enforcement proceedings.  *See Lucia*, 138 S. Ct. at 2060 (Breyer, J., concurring) ("Congress seems to have provided administrative law judges with two levels of protection from removal without cause—just what [*PCAOB*] interpreted the Constitution to forbid.").  Indeed, the United States previously conceded as much in *Lucia*.  *See* Br. for the United States at 47, *Lucia v. SEC*, 138 S. Ct. 2044 (No. 17-130), 2018 WL 1251862 (Feb. 21, 2018) ("Agency heads must be able to remove ALJs . . . . Otherwise, the agency head would be effectively in the same position as the Commission in [*PCAOB*]: The agency head would not [be] responsible for the [ALJ's] actions, and would instead be responsible only for deciding whether to initiate a removal action in light of the MSPB's standards." (internal quotation marks omitted)).

116.    Bonan is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that the ALJs used by the FDIC enjoy an unconstitutional level of protection from removal.

117.    Absent this Court's intervention, Bonan will continue to be subjected to the exercise of executive power by ALJ Whang.

118.    Bonan is not seeking through this lawsuit to retrospectively "unwind" anything that ALJ Whang has already done.  Instead, he is seeking to:

    a.    <u>Prospectively</u> block ALJ Whang and the FDIC from continuing the Enforcement Proceeding;

    b.    Otherwise <u>prospectively</u> block the continued exercise of power by ALJ Whang

119.    Bonan is entitled to a judgment under the Declaratory Judgment Act and Federal Rule of Civil Procedure 57 declaring that he is entitled to a constitutionally structured proceeding on a going-forward basis.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Frank William Bonan II respectfully requests that the Court enter each of the following forms of relief:

A.    Granting the forms of declaratory relief set forth above;

B.    A stay or injunction barring the administrative hearing currently scheduled for January 17, 2023, and any further administrative action;

C.    An award of the attorneys' fees, costs, and expenses that Bonan has incurred in connection with this action; and

D.    Such other relief as is just and proper.

Dated: January 3, 2023                    Respectfully submitted,

                                          /s/ Jan Paul Miller
                                          Jan Paul Miller – 58112(MO)
                                          Brian A. Lamping – 61054(MO)
                                          Allison Brauns Spors – 73099(MO)
                                          Thompson Coburn LLP
                                          One US Bank Plaza
                                          St. Louis, Missouri 63101
                                          P: (314) 552-6000
                                          F: (314) 552-7000
                                          jmiller@thompsoncoburn.com
                                          blamping@thompsoncoburn.com
                                          abspors@thompsoncoburn.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of January, 2023, I caused the foregoing document to be filed with the Clerk of the U.S. District Court for the Eastern District of Missouri via the Court's CM/ECF system.  I further certify that service was accomplished by sending hard copies of the same to the mailing address and/or email address, listed below:

Martin J. Gruenberg
Chairman
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429

Travis Hill
Vice Chairman
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, DC 20429

Federal Deposit Insurance Corporation
Debra Decker
Deputy Executive Secretary
550 17th Street, N.W.
Washington, DC  20429

Michael J. Hsu
Acting Comptroller
Office of the Comptroller of the Currency
400 7th St. SW
Washington, DC 20219

Rohit Chopra
Director
Consumer Financial Protection Bureau
1700 G St. NW
Washington, DC 20552

Jonathan McKernan
Senior Counsel
Federal Housing Finance Agency
Constitution Center
400 7th St., SW
Washington, DC 20219

Hon. Jennifer Whang
Administrative Law Judge
Office of Financial Institution Adjudication
3501 N. Fairfax Dr., Suite D-8116
Arlington, VA 22226

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Federal Deposit Insurance Corporation
CT Corporation System
120 S. Central Ave.
Clayton, MO  63105
CourtesyCopy@FDIC.gov

United States Attorney for the Eastern District
of Missouri
Thomas Eagleton U.S. Courthouse
111 S. 10th St., 20th Floor
St. Louis, MO  63102

/s/ Jan Paul Miller