# EXHIBIT A

FEDERAL DEPOSIT INSURANCE CORPORATION

WASHINGTON, D.C.

| | |
|---|---|
| In the Matter of | ) NOTICE OF INTENTION TO |
| | ) PROHIBIT FROM FURTHER |
| FRANK WILLIAM BONAN, II, individually | ) PARTICIPATION, NOTICE OF |
| and as institution-affiliated party of | ) ASSESSMENT OF CIVIL |
| | ) MONEY PENALTIES, |
| GRAND RIVERS COMMUNITY BANK | ) FINDINGS OF FACT, |
| GRAND CHAIN, ILLINOIS | ) CONCLUSIONS OF LAW, |
| | ) ORDER TO PAY, AND NOTICE |
| (INSURED STATE NONMEMBER BANK) | ) OF HEARING |
| | ) |
| RESPONDENT NMLS UI# N/A | ) FDIC-16-0254e |
| | ) FDIC-16-0256k |
| | ) |
| | ) |

The Federal Deposit Insurance Corporation ("FDIC") determined that Frank William Bonan II, ("Respondent" or "Bonan II"), was Chairman of the Board at Grand Rivers Community Bank, Grand Chain, Illinois ("Bank"), and an institution-affiliated party of the Bank. Respondent, directly or indirectly, recklessly participated or engaged in unsafe or unsound practices in connection with the Bank and breached fiduciary duties owed to the Bank. Respondent's practices and breaches were part of a pattern of misconduct and caused the Bank to suffer or probably suffer financial loss or other damage. Respondent's reckless practices and breaches involved personal dishonesty and demonstrate Respondent's willful and continuing disregard for the safety or soundness of the Bank.

### NOTICE OF INTENTION TO PROHIBIT FROM FURTHER PARTICIPATION

The FDIC issues this Notice of Intention to Prohibit from Further Participation and the Findings of Fact and Conclusions of Law (collectively "Notice of Charges") under 12 U.S.C. § 1818(e) and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308, subparts A and B.

This proceeding will determine whether an order should be issued against Respondent under the Federal Deposit Insurance Act, 12 U.S.C. § 1818(e), to prohibit Respondent from further participation in the conduct of the affairs of any insured depository institution or organization listed in 12 U.S.C. §1818(e)(7)(A), without the prior written approval of the FDIC and other appropriate Federal financial institutions regulatory agency.

## NOTICE OF ASSESSMENT OF CIVIL MONEY PENALTY

The FDIC further issues this Notice of Assessment of Civil Money Penalty, Findings of Fact and Conclusions of Law, and Order to Pay (collectively "Notice of Assessment") under 12 U.S.C. § 1818(i)(2) and the FDIC Rules of Practice and Procedure, 12 C.F.R. Part 308, subparts A and B.  This Notice of Assessment assesses a $105,000 civil money penalty against the Respondent under 12 U.S.C. § 1818(i)(2) unless the Respondent timely requests a hearing under 12 U.S.C. § 1818(i)(2)(H).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The FDIC makes the following allegations against Respondent:

**I.      Jurisdiction**

1.      At all times pertinent to the charges within, the Bank was a corporation existing and doing business under the laws of the State of Illinois, having its principal place of business at Grand Chain, Illinois.

2.      At all times pertinent to the charges within, the Bank was, an insured State nonmember bank, subject to the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1831aa, the Rules and Regulations of the FDIC, 12 C.F.R. Chapter III; and the laws of the State of Illinois.

3.	At all times pertinent to the charges within, Bonan II served as the chairman of the Bank's board of directors ("Board").  He was also at all times a member of the Bank's executive/loan committee.

4.	At all times pertinent to the charges within, Bonan II also served as president of the Southern Illinois Division for Peoples National Bank, National Association, McLeansboro, Illinois ("PNB").  At the same time, Bonan II also served as a member of the board of directors and as a member of the executive loan committee for PNB.

5.	At all times pertinent to the charges within, Respondent was an "institution-affiliated party" of the Bank as that term is defined 12 U.S.C. § 1813(u) and for purposes 12 U.S.C. §§ 1818(e)(7), 1818(i), and 1818(j).

6.	The FDIC has jurisdiction over the Bank, Respondent, and the subject matter of this proceeding.

## II.	Bonan II was a Dominant Manager and Policymaker Within the Bank

7.	From at least the start of the September 15, 2014, examination of the Bank, Bonan II was a dominant manager and policymaker within the Bank.

8.	In the late summer of 2015, PNB and the Bank began discussions for a merger in which PNB would acquire the Bank.  In late October 2015, Bonan II, abruptly resigned from the Board and caused PNB to pause the merger discussions.  In subsequent discussions between PNB and the Bank regarding Bonan II's return to the Board and continuation of the merger, Bonan II predicated his support of the merger on greater control of the Bank, including his ability to select the members of the board and to set his own salary.

9.	To keep the proposed merger between PNB and the Bank on track, Bonan II's demands were accepted.  Bonan II selected Jakob Campbell ("Campbell"), Whitney Stringer

("Stringer"), Grady Gaskins ("Gaskins"), and Lucas Phelps ("Phelps") to become members of the board.

### III.    The Evergreen Loan Relationship with the Bank and PNB

10.    In September 2015, Evergreen Drilling, LLC ("Evergreen Drilling"), an Indiana company, Evergreen Properties of Illinois, LLC ("Evergreen Properties"), and other co-borrowers ("Evergreen Entities"), collectively controlled by Gary L. Evans and his daughter, Lauren Abbey Evans (the "Evanses"), had outstanding loans with the Bank and PNB of approximately $11.7 million (the "Evergreen Loan Relationship").

11.    In September 2015, Evergreen Drilling and Evergreen Properties owed the Bank approximately $1.2 million.

12.     In September 2015, Evergreen Drilling, Evergreen Properties, and the Evergreen Entities owed PNB approximately $10.5 million.

13.    Some of the collateral securing loans to Evergreen Drilling and Evergreen Properties was pledged by the Evanses to the Bank and PNB.

14.    In January 2013, both PNB and the Bank made to loans to Evergreen Drilling to facilitate its acquisition of a Cabot 900 Series self-propelled drilling rig, known as Rig 23.  PNB loaned Evergreen Drilling approximately $1 million to facilitate its purchase of Rig 23.  PNB acknowledged the Bank's purchase money security interest ("PMSI") lien for $490,000.  The Evanses and Evergreen Drilling pledged Rig 23 to secure loans with the Bank and PNB.

15.    In 2013, the Bank acquired its PMSI in Rig 23 by advancing $490,000 to the equipment seller, which enabled Evergreen Drilling to purchase the carrier portion of the rig.  PNB had a prior blanket UCC lien securing all its loans to Evergreen Drilling.  In 2013, PNB took its security interest in Rig 23 through a filed blanket UCC-1 subject to the Bank's $490,000

PMSI.

16.     A commercial warehouse in Carmi, Illinois ("Carmi Warehouse"), was collateral pledged by the Evanses and Evergreen Properties to secure loans with the Bank and PNB.  In 2010, PNB took a first mortgage lien against the Carmi Warehouse to secure its loan to Evergreen Properties.  In 2014, the Bank took a second mortgage lien against the Carmi Warehouse to secure its loan to Evergreen Properties.

**IV.     PNB Determines the Evergreen Loan Relationship is Impaired**

17.     On or about February 2015, Evergreen Drilling's loans with PNB were renewed by Bonan II but were placed on interest only for six months with the understanding that Evergreen Drilling would reduce its debt to PNB by $1 million by August 5, 2015.

18.     On February 28, 2015, Bonan II informed Abbey Evans that PNB had approved a $900,000 increase to Evergreen Drilling's line of credit but that the larger commercial loan at PNB had been placed on interest only for six months.  Bonan II stated that PNB expected Evergreen Drilling to sell $1 million of non-critical assets within the next six months.

19.     By August 5, 2015, Evergreen Drilling's loans with PNB matured, and Evergreen Drilling had still not made the $1 million reduction of its debt to PNB.

20.     On or about August 7, 2015, Scott Collins ("Collins"), the PNB loan officer for the Evergreen Drilling loans, raised concerns with Bonan II about Evergreen Drilling's financial condition, noting Evergreen Drilling's inadequate debt service coverage ("DSC") and the need to present a plan for Evergreen Drilling to PNB's Watch Loan Committee.

21.     On or about August 7, 2015, in response, Bonan II informed Collins that PNB needed to move Evergreen Drilling to nonaccrual status and start selling its assets.

22.     Throughout August 2015, Bonan II and others at PNB, including Frank William

Bonan, Sr., president, general counsel, chairman of the board of directors at PNB, and Bonan II's

father ("Bonan Sr."), Keith Botsch ("Botsch"), a director at PNB and the Bank who was also

Evergreen Drilling's accountant, and Collins, continued to express concerns about the significant

financial difficulties facing Evergreen Drilling and its ability to service its debt with PNB.

23.     In late August 2015, on behalf of PNB, Bonan II proposed a forbearance plan to

Gary L. Evans and Evergreen Drilling pursuant to which Evergreen Drilling would sell specific

collateral in specific intervals over twelve months, and the PNB loans to Evergreen Drilling and

the Evergreen Entities would be renewed on interest only payment terms.

24.     On September 30, 2015, PNB identified $5.9 million of its loans to Evergreen

Drilling as substandard and placed them on nonaccrual.  As a result, PNB's loans to Evergreen

Drilling were impaired.

25.     As of September 30, 2015, PNB reported the $5.9 million Evergreen Drilling

nonaccrual amount on Schedule RC-N of its Call Report.

**V.      Bonan II Develops a Plan for the Evergreen Loan Relationship**

26.     In September 2015, Bonan II prepared a written "Plan For Evergreen" ("Plan")

that involved the sale of collateral, refinancing, and paying down approximately $5.4 million of

the $11.7 million debt of the Evergreen Loan Relationship.

27.     Bonan II's Plan included: a) the sale of the Carmi Warehouse to FWBII Holdings,

LLC ("FWBII-H"), Bonan II's limited liability company; b) the sale of Rig 24, which partially

secured Evergreen Drilling's loans with PNB; c) the sale-and-leaseback of other collateral (Rigs

19 and 20) with a new $1.7 million loan from the Bank; d) a $1.8 million loan from the Bank to

Abbey Evans secured by Gary Evans' security trading account.

28.     If the Carmi Warehouse sold for $1.1 million, the Bank would receive

approximately $641,350 loan payoff, and PNB would receive approximately $358,309 payoff.

29.    Bonan II's Plan also included a new limited liability company ("new LLC" or "Bentley Operating") owned by Abbey Evans.  Evergreen Drilling and Bentley Operating would enter into a purchase and leaseback arrangement whereby Bentley Operating would purchase Rigs 19 and 20 from Evergreen Drilling for $2 million.

30.    Under the Plan, the Bank would finance $1.7 million of the $2 million purchase by making two loans:  one to Abbey Evans, personally, and the other to Bentley Operating.  Rigs 19 and 20 would be leased back to Evergreen Drilling by Bentley Operating at 1.2 times the debt payment.  Evergreen Drilling's lease payments to Bentley Operating would be the source of funds used by Abbey Evans and Bentley Operating to repay their loans with the Bank.

31.    The last piece of the Plan would be that the Bank would make another loan to Bentley Operating for $1.8 million.  This loan would be secured by a securities trading account owned by Gary L. Evans that he would assign to the Bank as collateral after PNB released its assignment.

**VI.    Bonan II Attempts to Implement the Plan for the Evergreen Loan Relationship**

32.    In early October 2015, Bonan II directed Gaskins to prepare written commercial loan requests from Abbey Evans and Bentley Operating to be presented to the Bank's executive loan committee ("Loan Committee") made up of Bonan II, Brent Clark ("Clark"), and Botsch, who had been given authority by the Board to make loans up to the legal lending limit of the Bank.

33.    On October 7, 2015, without the benefit of a personal financial statement from Abbey Evans, Bonan II directed Gaskins to send out three separate loan requests to the members of the Bank's Loan Committee.  The three loans totaled $3.5 million.  Two of the three loans

were to be made to Bentley Operating, and the third loan to Abbey Evans.

34.     The first Bentley Operating loan was for $1.8 million to be used to refinance existing Evergreen Drilling debt with PNB.  This loan was secured by an assignment of marketable securities from Gary Evans valued at $1.8 million, provided that PNB released its prior assignment in exchange for Evergreen Drilling's debt reduction of the $1.8 million using the loan proceeds from Bentley Operating.

35.     The second loan to Bentley Operating for $850,000 and the third loan to Abbey Evans for $850,000 were to be used by Bentley Operating to purchase certain oil rigs and equipment from Evergreen Drilling.  These loans required that PNB release its prior liens against the specific oil rigs and equipment in exchange for a $1.7 million reduction of Evergreen Drilling's debt.  The release of PNB's liens would permit Bentley Operating, as the purchaser, to pledge these purchased oil rigs and equipment as collateral to secure the second and third loan from the Bank.

36.     After purchasing the specific oil rigs and equipment from Evergreen Drilling, Bentley Operating would then leaseback the same oil rigs and equipment to Evergreen Drilling, which would generate lease income to repay its three loans with the Bank.

37.     The Bank's two loans, each for $850,000, to Bentley Operating and Abbey Evans, were structured in an attempt to avoid the Bank's legal lending limit for loans to one borrower.

38.     Bonan II acknowledged in an email to Clark, Botsch, Gaskins, and others dated October 8, 2015, that Bentley Operating was purchasing the oil rigs and equipment from Evergreen Drilling, and the $850,000 loan to Abbey Evans would be used by Bentley Operating together with its loan for $850,000 to fund the purchase.

39.     Botsch initially voted to approve the Bentley Operating Loans but rescinded his

vote and abstained due to his professional relationship as the accountant for Evergreen Drilling.

40.     Clark requested more information addressing his concerns of if the Bank would have enough collateral and the "ultra low" fees relative to the perceived risk.

41.     Bonan II responded to Clark's concerns by saying that the loan was a good loan.

42.     After getting Bonan II's response, Clark ultimately approved the loans.

43.     Although Bonan II was privy to the negative credit information pertaining to Evergreen Drilling's loans with PNB, including the $5.9 million substandard classification and nonaccrual, inadequate DSC, and forbearance negotiations, he did not disclose any of this negative credit information to Clark.

44.     Gaskins advised Abbey Evans that the Bentley Operating Loans had been approved by the Loan Committee, but the Bank still had to get releases from PNB.

45.      On October 19, 2015, Bonan II's uncle (a PNB board member), Hunt Bonan, told Botsch that PNB would not be releasing its Evergreen collateral until Bonan II told PNB where the money to pay down the Evergreen debt at PNB was coming from.

46.     Earlier on October 19, 2015, Collins had informed Gaskins that because PNB's Evergreen Drilling loan was in collections, he could not do anything regarding the Evergreen Drilling equipment being purchased by Bentley Operating until Bonan II got approval to allow Evergreen Drilling to sell the equipment.

47.     Botsch directed Stringer not to fund the Bentley Operating Loans until Bonan II disclosed the source of the funds being used to reduce Evergreen's debt with PNB.

48.     The Bank's loans to Bentley Operating and Abbey Evans, although approved by the Loan Committee, were never funded.

**VII.    Bonan II Structures the Sale of Evergreen Properties Collateral and Arranges Financing to Uncreditworthy Borrowers**

49.    On or about September 8, 2015, Bonan II advised Collins that Bonan II sold the Carmi Warehouse for Evergreen Properties, which would net them $1.1 million to pay down its PNB debt.

50.    On or about September 14, 2015, Bonan II informed DeeDee O'Bright, his assistant with PNB, Alanna Sosenko, an attorney for the Bank, and Gaskins that he thought he would buy and leaseback the Carmi Warehouse from Evergreen Properties using his own company FWBII-H.  Bonan II explained that the purchase price would be $1.25 million, but the net at closing to Evergreen Properties would be $1.1 million because Evergreen Properties would give him $150,000 at closing which would be held as a reserve to pay the closing costs and the first two years of rent from Evergreen Properties to FWBII-H.  Bonan II would use the $150,000 towards his twenty percent (20%) down payment, which would be $250,000.  Bonan II further explained that after the $150,000 reserve for lease payments was exhausted, Evergreen Properties would then pay FWBII-H $8,250 monthly for 60 months.  Bonan II directed Gaskins to find a bank that would do this transaction.

51.    On or about September 22, 2015, Bonan II arranged for the Bank's attorney, Patrick Hunn ("Hunn") to prepare a Purchase and Sale Agreement between Evergreen Properties, as the seller, and FWBII-H, as the buyer, for the sale of the Carmi Warehouse for $1.25 million.

52.    On or about September 22, 2015, Bonan II also arranged for Hunn to prepare a Lease Agreement between Evergreen Properties, as lessee, and FWBII-H, as lessor, for the Carmi Warehouse.

53.    On or about October 16, 2015, Bonan II requested a loan from Carrollton Bank

("Carrollton"), Clayton, Missouri to finance the sale and leaseback involving FWBII-H's purchase of the Carmi Warehouse from Evergreen Properties.

54.     On or about October 16, 2015, Bonan II directed Gaskins to provide Chris Dickey ("Dickey") from Carrollton with Bonan II's financial information so the latter could begin its internal process to review FWBII-H's loan request.

55.     On October 16, 2015, Gaskins, on behalf of Bonan II, sent Dickey an email regarding the "Bonan Loan Request" as well as various Bonan II financial statements, including a signed personal financial statement ("PFS").  Gaskins also sent Dickey unsigned copies of a Lease Agreement and Purchase and Sale Agreement between Evergreen Properties and FWBII-H.

56.     On October 19, 2015, Dickey indicated there was strong interest at Carrollton to consider the Bonan loan request and requested financials on Evergreen Properties as they were the sole tenant.

57.     On November 5, 2015, Carrollton made a conditional commitment to Bonan II to loan up to $1 million to FWBII-H to finance the sale and leaseback of the Carmi Warehouse.

58.     After some negotiations, Bonan II made handwritten changes to Carrollton's commitment letter and returned the signed, revised commitment on November 15, 2015.

59.     The revised deal increased the proposed loan to $1.15 million, and the additional $150,000, representing a 24-month lease payment reserve, would be held by Carrollton as collateral but would not be applied to FWBII-H's loan payments for 24 months.  Instead, FWBII-H would make loan payments totaling $150,000 for 24 months.

60.     The property was appraised at $1.245 million, which was $5,000 below the purchase contract price, so Carrollton would have required Bonan II to pay the $5,000 difference

between the appraised value and the purchase contract price.

61.     Bonan II abandoned the Carrollton loan proposal.

62.     On or before December 16, 2015, Bonan II arranged for two of his employees, Adam Tate ("Tate") and Jason Harbison ("Harbison"), instead of FWBII-H, to purchase the Carmi Warehouse, and to obtain financing from the Bank.

63.     Beginning on or about December 17, 2015, on behalf of Bonan II, Gaskins and Kassie Winters ("Winters"), the Head of Loan Operations for the Bank, began preparing a $1.25 million loan request for Tate and Harbison acting through a yet-to-be-formed limited liability company.

64.     On December 18, 2015, Winters sent the Bank's directors a $1.25 million loan request for Tate and Harbison acting through a yet-to-be-formed limited liability company to be named 618 Holdings, LLC ("618 Holdings").

65.     Campbell questioned the appraised value of the Carmi Warehouse.  Campbell also noted that the five-year lease agreement between 618 Holdings and Evergreen Properties set out in the loan request as a cash flow source for repayment of the loan was meaningless because the lessee, Evergreen Properties, was in a cash flow bind due to the depressed oil business.

66.     After initially voting to approve the loan to Tate and Harbison/ 618 Holdings on December 22, 2015, Bonan II informed Winters that he had to abstain from voting because Tate and Harbison worked for him.

67.     Campbell continued to oppose the $1.25 million loan request from Tate and Harbison/618 Holdings unless the Evergreen Properties used $500,000 received from the sale of the Carmi Warehouse to pay down Evergreen Drilling's loan with the Bank.

68.     On December 23, 2015, Bonan II incorrectly informed Campbell that PNB only

had a second mortgage on the Carmi Warehouse that had to be paid off.  However, PNB had a first mortgage, and the Bank had a second mortgage.

69.     Bonan II told Campbell that the loan to Tate and Harbison, acting through 618 Holdings, would pay off Evergreen Properties' loan with the Bank.  Bonan II also told Campbell that the payoff of roughly $630,000 of Evergreen Properties' loan to the Bank would reduce the debt the Bank's shareholders would have to assume through the Bank's holding company upon the proposed merger between PNB and the Bank.  Under the terms of the proposed merger, PNB would not assume any loans the Bank had made to Evergreen Drilling and Evergreen Properties.

70.     Bonan II spoke with Campbell to persuade him to vote to approve the Tate and Harbison/618 Holdings loan request and represented that he already had the votes from the other directors to approve the loan request.

71.     Although Bonan II misleadingly represented to Campbell that he already had the votes from the other directors to approve the loan request from Tate and Harbison, the other directors had not yet approved the loan.

72.     When Bonan II made his misleading representation to Campbell, Stringer had already told him that she would abstain from voting for the approval of the 618 Holdings loan request.  Gaskins voted to approve the 618 Holdings but felt he had no choice because Bonan II would have fired him if did not vote to approve the loan request.

73.     After receiving the representation from Bonan II, Campbell withdrew his opposition and voted to approve the $1.25 million loan to 618 Holdings.  Phelps, who had been waiting for Campbell's decision, then also voted to approve.

74.     Bonan II knew about Evergreen Drilling's negative credit position with PNB.  He knew that PNB had placed $5.9 million of its $10.5 million loan relationship on nonaccrual and

13

internally classified that nonaccrual portion as substandard. He also knew about the November 3, 2015, loan extension agreement ("Extension Agreement") between PNB and Evergreen Drilling and Bonan II did not disclose any of this information to Campbell or the other members of the Board who were asked to approve the $1.25 million loan to 618 Holdings.

75. Other than rent payments it would receive from Evergreen Drilling for the use of the Carmi Warehouse, Evergreen Properties did not have income or other cash flow from which it could pay its lease obligations to Tate and Harbison, acting through 618 Holdings, after the initial reserve of $150,000 was exhausted. Tate and Harbison could not personally pay the $7,753 monthly loan obligation to the Bank.

76. The $1.25 million loan to 618 Holdings was approved by the Board on December 23, 2015, even though 618 Holdings had not yet been formed under Illinois law and the appraisal used to support the loan request was addressed to Carrollton Bank instead of the Bank.

77. On January 3, 2016, Bonan II told Gaskins that the Evanses wanted to keep $100,000 from the Carmi Warehouse sale proceeds for operations. Bonan II directed Gaskins to figure out with Collins how much money the Bank and PNB would then receive from the Carmi Warehouse sale proceeds.

78. The purchase and sale agreement and lease agreement between Evergreen Properties and 618 Holdings were not executed until January 7, 2016. The purchase and sale agreement between Evergreen Properties and 618 Holdings was backdated to November 1, 2015 (prior to 618 Holdings' formation and prior to the Bank's approval of the loan to purchase the Carmi property).

79. On January 7, 2016, the Bank's loan to 618 Holdings was funded after Tate and Harbison, on behalf of 618 Holdings, signed the Bank's promissory note in the amount

$1,262,109.75, which was $12,109.75 more than the Board had authorized.

80. On January 7, 2016, the sale of the Carmi Warehouse closed. From the proceeds of the Bank's $1,262,109.75 loan: a) PNB received $358,309.12 to payoff Evergreen Properties' first mortgage loan; b) the Bank received $637,681.88 to payoff Evergreen Properties' second mortgage loan; c) $150,000 was escrowed to establish an 18-month lease payment reserve account from which monthly payments of $7,753 were to be paid to 618 Holdings, so it could make monthly loan payments to the Bank; and d) Evergreen Properties received $100,000 for the Evanses to use for operations.

81. Aside from the 18-month lease payment reserve, the ability of 618 Holdings to repay its debt to the Bank was entirely dependent upon the ability of Evergreen Properties to make monthly lease payments, and Evergreen Properties was dependent upon income generated from Evergreen Drilling's operations.

82. Subsequent to the closing, the Bank's loan to 618 Holdings was classified substandard by FDIC and Illinois Department of Financial and Professional Regulation ("IDFPR") examiners, who also recommended that the loan be placed on nonaccrual status until full payment of principal and interest could be reasonably assured. Thereafter, the Bank placed its loan to 618 Holdings on nonaccrual and made a loan impairment allocation that it adjusted after an FDIC and IDFPR visitation in September 2016. In early January 2017, the Board charged off $500,000 against the Bank's loan to 618 Holdings. Subsequent thereto, 618 Holdings defaulted on its $1.25 million loan and acquiesced to the use of a deed-in-lieu to avoid foreclosure, conveying the Carmi Warehouse to the Bank. After the deed-in-lieu, the Bank wrote down the value of the Carmi Warehouse by an additional $13,760.

**VIII.   Bonan II Directs the Bank to Release Rig 23, Evergreen Drilling Collateral**

83.     On or about September 14, 2015, Evergreen Drilling, as seller, entered into a Letter of Intent with U.S. Energy Exploration Corp., ("US Energy"), as buyer, to sell a Service King 775 drilling rig, known as Rig 24, for $1,559,000.

84.     On or about October 9, 2015, US Energy sent Evergreen Drilling a signed Sale and Purchase Agreement ("Rig Purchase Agreement") to purchase Rig 24 for $1,559,000. Abbey Evans advised Bonan II that they still needed a UCC-1 release from Grand Rivers and PNB on Rig 24 to attach to the Rig Purchase Agreement. Bonan II forwarded Abbey Evans' request to Collins and Gaskins and instructed them to get these releases.

85.     Under paragraph 3.1 (c), "Title to Properties; Absence of Liens and Encumbrances," of the Rig Purchase Agreement, Evergreen Drilling agreed to provide US Energy with a list of all liens with proof of satisfaction of indebtedness and/or release of security interest prior to closing. Evergreen Drilling also represented and warranted to US Energy that the list of liens listed in Exhibit C was complete.

86.     Evergreen Drilling listed two separate liens in Exhibit C. The first was listed as a "Security Interest given to [PNB], a record of which is filed with the Indiana Secretary of State Filing No. 201100005563790." This described PNB's blanket UCC-1 securing all of Evergreen Drilling's equipment. The second lien listed was a "Security Interest given to [the Bank], record of which is filed with the Illinois Secretary of State at File No. 017906194." This described the Bank's UCC-1 securing a PMSI in Evergreen Drilling's Rig 23.

87.     Gaskins explained to Bonan II that the Bank did not have a blanket UCC-1 as PNB did; the Bank only had a lien on a specific rig. Gaskins added that all he needed to do was prepare the termination that could be sent out but not filed with Secretary of State until payment was received. Gaskins also told Bonan II that the Bank just needed the attachments to the Rig

Purchase Agreement to confirm the termination was for the same equipment using the same wording in the UCC-1 and the Rig Purchase Agreement.

88.     Bonan II never provided the requested information to the Bank or PNB which described the drilling rig (Rig 24).

89.     Collins also advised Clytie Zimmerman ("Zimmerman"), PNB's Executive Vice President, that PNB never received the information to determine what equipment PNB should release in order to know who owned the equipment.

90.     On or about October 13, 2015, Collins, on behalf of PNB, informed Abbey Evans that he was working on the UCC release and requested the list of the assets Evergreen Drilling was selling to US Energy.  Evergreen Drilling provided Collins with a copy of Appendix A to the Rig Purchase Agreement, which included the list.

91.     On or about October 16, 2015, after Winters sent Bonan II the Bank's unrecorded UCC-1 terminations for Illinois and Indiana, Abbey Evans sent an email with attachments of all the required documents per the escrow instructions and the Rig Purchase Agreement, to US Energy, the escrow agent Old National Wealth Management, Bonan II, and Collins.  Included in the attached documents were copies of the Bank's unrecorded UCC-1 terminations of its PMSI in Rig 23 for both Illinois and Indiana.

92.     Bonan II assured Denny Boyer ("Boyer"), president of US Energy, that he would record the original UCC termination statements when US Energy's initial money from the escrow agent was received by PNB.

93.     On or about October 16, 2015, US Energy's transport trucks picked up Rig 24 and its drilling machinery and equipment from Evergreen Drilling's Carmi Warehouse.

94.     On October 16, 2015, the escrow agent, Old National Wealth Management, wired

funds in the amount of $1,262,790 to PNB.

95.     On or about October 23, 2015, Collins sent Abbey Evans an email with an attached list of Evergreen Drilling equipment, including Rig 23, and asked her to review the list and mark where each piece of equipment was located.

96.     On or about October 26, 2015, Abbey Evans replied that Rig 23 was located in Canadian, Texas.

97.     On or about October 27, 2015, Bonan II sent Collins, Zimmerman, Bonan Sr., and Hunt Bonan, an email informing them that Abbey Evans was working on getting financing using $2 million of Evergreen Drilling equipment from a list she previously sent to Collins.  Bonan II also added that Rig 23 remained to be sold and he thought it was worth not less than $2.2 million.

98.     On October 28, 2015, PNB's Executive Loan Committee held a teleconference meeting to review and discuss Evergreen Drilling's request that maturity dates on its two loans with PNB be extended until April 30, 2016.  Bonan II, Bonan Sr., Hunt Bonan, and Botsch participated in the teleconference.  The Executive Loan Committee was advised that Evergreen Drilling recently sold Rig 24 and the net proceeds of approximately $1.4 million would be applied with $1.1 million to existing PNB debt, $140,000 to the same debt upon release from the escrow agent, and $160,000 to Evergreen Drilling to cover the costs of moving Rig 23 from Texas to the Carmi Warehouse and preparing it for sale.  PNB's Executive Loan Committee unanimously voted to approve Evergreen Drilling's requests with Botsch abstaining from voting.

99.     On or about November 2, 2015, after the PNB Executive Loan Committee approved Evergreen Drilling's requests to extend its loan maturity dates, PNB sent the Evanses the Extension Agreement.

100.    On or about November 2, 2015, Botsch, on behalf of Gary Evans, asked Bonan Sr. for an informational phone call or meeting to explain why Evergreen Drilling needed $160,000 and how to get Rig 23 back to the Carmi Warehouse from Texas.  Botsch indicated that Gary Evans thought it would cost about $50,000 to $75,000 to move Rig 23 to the Carmi Warehouse.

101.    On November 3, 2015, the Extension Agreement was signed.  In return for PNB's extension of the maturity dates on the two Evergreen Drilling loans, with a combined indebtedness of $10,427,024, Evergreen Drilling promised to pledge new collateral set out on Exhibit A free and clear of all liens and encumbrances.  Rig 23 was one of the pieces of Evergreen Drilling equipment listed and described on Exhibit A.  In addition, Evergreen Drilling agreed to make every reasonable effort to liquidate a minimum of $1.75 million from the new collateral with the proceeds therefrom applied to its two loans at PNB's discretion.  The Extension Agreement also provided that $1,262,790, representing the proceeds received to date from the sale of Rig 24, held by PNB in escrow, would be applied as specified, including the payment of $160,000 to Evergreen Drilling.

102.    On November 3, 2015, Abbey Evans emailed Collins requesting that $160,000, from the $1,262,790 in sale proceeds of Rig 24, be deposited into Evergreen Drilling's checking account.

103.    On or about November 11, 2015, April Riecken ("Riecken"), on behalf of Evergreen Drilling, emailed Boyer at US Energy and Bonan II informing them that all components of Rig 24 had left the Carmi Warehouse and requested that US Energy authorize the escrow agent (i.e., Old National Wealth Management) to remit the final funds, approximately $140,000, to PNB.

104.    Boyer responded to Riecken, copied Bonan II, and explained that PNB first needed to follow through with the promised paperwork reflecting its deletion of Rig 24 as collateral from the UCC-1 filed with the Indiana Secretary of State before he would authorize the escrow agent to release any funds to PNB.

105.    On November 12, 2015, PNB filed its deletion of Rig 24 as collateral with the Indiana Secretary of State.

106.    On the same date, Winters informed Bonan II that the Bank's loan to Evergreen Drilling had a current balance of $549,945.37, secured by a UCC on a drilling rig and equipment, and the Bank's loan to Evergreen Properties had a current balance of $637,149.32, secured by the Carmi Warehouse.

107.    Winters further explained that, based upon documentation in the file, the Bank's loans to Evergreen Drilling and Evergreen Properties were not cross collateralized.  Winters commented that the one rig and specific equipment that goes with it were secured with a PMSI UCC, and the Carmi Warehouse secured the loan to Evergreen Properties.  Bonan II replied to Winters and acknowledged that the Bank had a PMSI in Rig 23.

108.    On November 13, 2015, at 6:55 am, Boyer emailed Riecken, copied Bonan II, and thanked her for her help with PNB's recording of its deletion of Rig 24 as collateral and added that if US Energy can obtain the Bank's UCC release, it should be finished.

109.    Bonan II, without comment, forwarded Boyer's request to Gaskins and Winters.

110.    On November 13, 2015, at 8:45 am, the Bank filed a termination of its Rig 23 PMSI UCC-1 with the Illinois Secretary of State.  At 9:24 am, on the same date, the Bank filed a termination of its Rig 23 PMSI UCC-1 with the Indiana Secretary of State.

111.    Rig 24 was never collateral securing Evergreen Drilling's loan with the Bank.

20

112.    Riecken informed Bonan II that Gary Evans wanted to know how Evergreen Drilling should handle a UCC-1 from the Bank (even though there was no collateral for Rig 24 at the Bank) because Boyer wanted a recorded UCC-1.

113.    Bonan II forwarded Riecken's request to Gaskins and Winters instructing them to "Get this bulkshit [sic] done this morning."

114.    Winters then emailed Riecken, copied Bonan II, with an attached copy of the Bank's recorded UCC termination from the Indiana Secretary of State, which Riecken forwarded to Boyer.

115.    On or after November 13, 2015, the Bank's loan to Evergreen Drilling with an outstanding balance due of approximately $549,945 was unsecured.  In early January 2017, the Bank charged off the Evergreen Drillings loan in the amount of $489,268.  The Bank's PMSI in Rig 23 was approximately $489,268, which was lost after Bonan II's actions and inactions.

## IX.    Respondent Caused Financial Loss to the Bank

116.    Bonan II's orchestration of the Bank's $1.25 million loan to his two employees, acting through 618 Holdings, caused a loss to the Bank.  Bonan II's directions to release Rig 23, the only collateral securing Evergreen Drilling's impaired $640,000 loan with the Bank, caused the Bank to suffer financial loss and placed the Bank at risk of suffering additional loss.

117.    The loss to the Bank as result of Bonan II's misconduct includes at least $513,760 in loan proceeds to 618 Holdings and $489,268, when the Bank released, without consideration, its PMSI in Rig 23 as collateral.

118.    As of the joint January 2016 examination by the FDIC and IDFPR, the 618 Holdings loan was deemed substandard, and examiners recommended that the loan be placed on

nonaccrual until full payment of principal and interest could be reasonably assured; of the $640,000 loan to Evergreen Drilling, approximately $536,000 was deemed substandard.

## X.    Conclusions of Law

119.    As a result of the above acts, omissions, and practices, Respondent recklessly engaged or participated in unsafe or unsound banking practices in connection with the Bank under 12 U.S.C. §§ 1818(e) and (i)(2).

120.    As a result of the above acts, omissions, and practices, Respondent breached his fiduciary duty to the Bank under 12 U.S.C. § 1818(e) and (i)(2).

121.    The above acts, omissions, and practices resulted in financial loss, likely financial loss, or other damage to the Bank under 12 U.S.C. § 1818(e) and (i)(2).

122.    The acts, omissions, and practices of the Respondent alleged above demonstrate the Respondent's personal dishonesty under 12 U.S.C. § 1818(e).

123.    The acts, omissions, and practices of the Respondent alleged above demonstrate Respondent's willful and continuing disregard for the safety and soundness of the Bank under 12 U.S.C. § 1818(e).

124.    Respondent's above-described acts, omissions, and practices were part of a pattern of misconduct under 12 U.S.C. § 1818(i)(2).


## ORDER TO PAY

Based on the above Findings of Fact and Conclusions of Law, the FDIC determined that Respondent's reckless practices and breaches merit a civil money penalty.  After taking into account the appropriateness of the penalty with respect to the following mitigating factors under 12 U.S.C. § 1818(i)(2)(G), the size of the Respondent's financial resources and good faith, the

gravity of the violation, the history of previous violations, and such other matters as justice may require, it is:

ORDERED that by reason of Respondent's practices and breaches listed above, a $105,000 penalty is assessed against Frank William Bonan II under 12 U.S.C. § 1818(i)(2).

FURTHER ORDERED that the Order to Pay is stayed until 20 days after the date of service of this Notice of Assessment to allow Respondent time to request a hearing.

If Respondent wants to object to the Order to Pay, Respondent must formally request a hearing in writing within 20 calendar days after service of this Notice of Assessment, as explained at 12 U.S.C. § 1818(i)(2)(H).  Respondent may request a hearing in a formal Answer, as specified in 12 C.F.R. § 308.19.  **If Respondent fails to request a hearing to object to the Order to Pay within 20 calendar days from the date of service of this Notice of Assessment, the penalty assessed against Respondent will be final and unappealable under 12 U.S.C. § 1818(i)(E)(ii) and 12 C.F.R. § 308.19(c)(2) and must be paid within 60 calendar days after the date of service of this Notice of Assessment.**

### NOTICE OF HEARING

Respondent must file an Answer to object to the Notice of Charges within 20 days from the date of service under 12 C.F.R. § 308.19.  Respondent may file one document containing both the Answer to the Notice of Charges and a request for hearing on the Order to Pay.  The hearing will be held before an Administrative Law Judge (ALJ) assigned by Office of Financial Institution Adjudication (OFIA) under 5 U.S.C. § 3105.  The hearing on the Notice of Charges will begin on a date set by the ALJ in Benton, Illinois or in another location set by the ALJ.  The hearing will be public and conducted in accordance with 12 U.S.C. §§ 1811-1831aa, the Administrative Procedure Act, 5 U.S.C. §§ 551-559, and 12 C.F.R. Part 308, subparts A and B.

An original and one copy of all papers filed in this proceeding must be served upon OFIA, 3501 N. Fairfax Drive, Suite VS-D8116, Arlington, VA 22226-3500, in the manner specified at 12 C.F.R. § 308.10. Also, copies of all papers filed in this proceeding must be served upon the following: FDIC Administrative Officer, 550 17th Street, N.W., Washington, D.C. 20429-9990; Seth P. Rosebrock, Assistant General Counsel, and Sam Ozeck, Enforcement Section, Federal Deposit Insurance Corporation, 550 17th Street NW, Washington, D.C. 20429-9990; and Monica M. Tynan, Regional Counsel, Chicago Regional Office, Federal Deposit Insurance Corporation, 300 S. Riverside Plaza, Suite 1700, Chicago, Illinois 60606. Respondent is encouraged to file any subsequent documents electronically with OFIA at ofia@fdic.gov.

### PRAYER FOR RELIEF

The FDIC prays that an Order of Removal and Prohibition from Further Participation under 12 U.S.C. § 1818(e) and an Order to Pay in the amount of $105,000 and assessed under 12 U.S.C. § 1818(i)(2), be issued against Frank William Bonan II.

Pursuant to delegated authority.

Dated at Washington, D.C., this 5th day of May, 2021.

_____
Doreen R. Eberley
Director
Division of Risk Management Supervision